**IN THE COURT OF APPEALS OF IOWA**

No. 14-0918
Filed June 15, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOSHUA FRANK MCCOY,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

Defendant appeals his conviction for murder in the first degree and robbery in the first degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik and Bridget A. Chambers, Assistant Attorneys General, for appellee.

Heard by Tabor, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

Christopher Byers was shot and killed in his living room while selling marijuana to Marquice Morris and Joshua McCoy. Tanner Harvey and Bobby Page, Byers' friends, were in the home at the time of the shooting. According to Page, Morris and McCoy pulled out handguns during the transaction for the purpose of robbing Byers; either Morris or McCoy fired a shot into the floor and the other shot Byers in the chest; and Morris and McCoy fled the scene. Morris and McCoy were arrested and charged with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2 (2013), and robbery in the first degree, in violation of Iowa Code sections 711.1 and 711.2. They were tried separately and each was convicted as charged. McCoy challenges his convictions and sentences.

I.

On the morning of June 26, 2013, Dakata Diggins, who was dating Morris at the time, picked Morris up from the Fort Des Moines correctional facility, purportedly to look for employment. Morris told one of his roommates that he "was going to commit or do a lick in some fashion in the future," which means to make money quickly, usually through illegal activity. As Diggins was driving, Morris saw Byers walking along the street and instructed Diggins to pull over. Morris and Byers spoke, and Byers provided Morris with Byers' telephone number. During that conversation and subsequent telephone conversations, Morris arranged to buy marijuana from Byers.

Later in the morning, Diggins and Morris went to Joshua McCoy's house. While at McCoy's house, Morris used Diggins' phone to call Byers. Morris, McCoy, and Diggins then left McCoy's house to go to Nikki Taylor's house. From there, Morris and McCoy walked to an apartment complex a short distance away. They asked Diggins to drive and meet them there. At the apartment complex, Morris and McCoy spoke to Byers, who was in the parking lot in a red Jeep with another man. After speaking with Byers, Morris and McCoy returned to Diggins' vehicle and instructed her to follow the red Jeep.

Diggins followed the red Jeep to Byers' house and parked her vehicle in front of Byers' neighbor's house. McCoy and Morris exited Diggins' vehicle and went into the house while Diggins stayed in the van. Approximately twenty minutes later, according to Diggins, she heard something that sounded like fireworks. Immediately after, McCoy and Morris rushed back to the van and instructed Diggins "to go" and "drive fast." Morris told Diggins to drop them off at McCoy's house, which she did. Morris told Diggins to go to Taylor's house and wait.

Page testified he was good friends with Byers. On the day in question, Byers went to Page's house and asked for a ride somewhere. Page agreed. As they went outside to get into Page's truck, Harvey pulled up in his red Jeep. Page and Harvey had been planning to go fishing later that day. Page told Harvey to follow them to Byers' house. However, Byers went with Harvey in the red Jeep and Page left to gather his fishing gear with the understanding they would meet at Byers' house.

When Page arrived at Byers' house, Byers and Harvey were not yet there. According to Page, when Harvey and Byers returned, they were being followed by a van with a woman and two men, now known to be Morris and McCoy, inside. Page went into the house, followed by Harvey and Byers with McCoy and Morris behind them. Harvey went into the kitchen to light a cigarette, leaving Page on the couch with Byers. Page testified he was looking down at his phone and when he looked up he saw Byers had pulled out a bag of marijuana from a backpack. Morris or McCoy said, "Oh, what now?" Page testified either McCoy or Morris shot at the ground, and the other shot Byers in the chest. One held a semi-automatic firearm and the other a revolver. Before leaving, either McCoy or Morris asked for Page's and Harvey's car keys. After McCoy and Morris left, according to Page, he and Harvey also left the house to give chase. After an unsuccessful pursuit, Page and Harvey went to Page's house. They talked to some of Page's family members, decided to delete their phone calls, and then called 911. When they returned to Byers' home, Byers was dead.

After Diggins had been at Taylor's house for approximately thirty minutes, McCoy and Morris arrived. Diggins overheard McCoy say he shot in the direction of where the guy was standing. McCoy also said he was going to cut his hair.

Following an investigation, in which Page identified Morris and McCoy in a photo array, police arrested Morris at the correctional facility the night of the shooting. Morris told the detectives he had been having sex with his girlfriend all day and denied being with McCoy. McCoy was also arrested on the night of the shooting. The police found him hiding in a closet at Taylor's house. He had just

shaved his head. McCoy called Taylor from the jail after his arrest while the police were still searching Taylor's residence. McCoy told Taylor he hid a gun under the couch cushion where he had been laying down. The police obtained a search warrant and discovered a Taurus 9mm handgun underneath the couch cushion.

A criminalist testified the 9mm could have fired the fatal bullet. A bullet was also found in the floor joist of the Byers' living room, corroborating Page's testimony that either Morris or McCoy fired a shot into the ground and the other shot Byers. The bullet in the floor joist was likely fired from a .357 caliber gun. It could not have been fired from the 9mm Taurus discovered under the couch cushions at Taylor's residence. The police did not recover a second weapon.

A jailhouse informant testified at McCoy's trial. The informant testified that McCoy told him what happened that day. He testified Morris and McCoy intended to rob Byers. Morris told McCoy, when they were outside Byers' house, that "when he upped his, you better up yours—basically when Mr. Morris pulls out his gun, be sure to pull out yours." He testified that McCoy told him that Morris fired a shot into the floor to scare Byers to hand over the money and drugs. McCoy was not expecting the shot, it startled him, and he pulled the trigger in reaction. McCoy and Morris took a couple hundred dollars and a quarter-pound of marijuana.

II.

McCoy contends the district court erred in excluding as hearsay certain sworn statements of Tanner Harvey. Morris contends the statements should

have been admitted as former testimony of an unavailable witness pursuant Rule 5.804(b)(1). We review the admissibility of hearsay evidence for corrections of errors at law. *See State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000).

To provide context, Morris and McCoy were charged as co-defendants and scheduled to be tried together. The State identified Harvey as a witness. Morris and McCoy noticed the deposition of Harvey to occur in February 2014, but Harvey refused to participate in the deposition. At the time he was scheduled to be deposed, Harvey was incarcerated on unrelated charges. McCoy moved to exclude Harvey as a witness due to Harvey's refusal to participate in the deposition. The district court scheduled a hearing on the motion to exclude. Harvey testified at the hearing. At the hearing, Harvey testified that, on the day of the shooting, he was intoxicated and that he told the police a story that matched Page's rather than what he really remembered. He also informed the court that he was invoking his right against self-incrimination, that he would continue to refuse to be deposed, and that he would refuse to testify at trial.

Subsequent to the court's ruling, the co-defendants' trials were severed. Prior to the time of trial, McCoy changed his position with respect to Harvey. McCoy sought to use Harvey's former testimony from the hearing on the motion to exclude. Specifically, McCoy wanted to use Harvey's statements that he was intoxicated on the day of the shooting and that he changed his story to match Page's story. The district court denied McCoy's motion. Harvey did not testify at McCoy's trial.

The State argues McCoy has failed to preserve error because the court's ruling on the motion in limine was equivocal. We disagree. While the court initially made a preliminary ruling denying the motion in limine subject to reconsideration during trial, the district court ultimately concluded the evidence was hearsay and inadmissible. There was an unequivocal ruling on the evidence sufficient to preserve error. *See State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979) (stating "if the ruling reaches the ultimate issue and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial").

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(c). The general rule is that hearsay is inadmissible. *See* Iowa R. Evid. 5.802. There are numerous exceptions to the hearsay rule, including the exception related to the former testimony of an unavailable witness. Iowa Rule of Evidence 5.804(b)(1) provides the "following are not excluded by the hearsay rule if the declarant is unavailable as a witness":

> Testimony given as a witness at another trial or hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

We conclude the district court did not err in excluding Harvey's former testimony. The State concedes Harvey is unavailable pursuant to Iowa Rule of Evidence 5.804. However, the State did not have a "similar motive" to develop

the testimony during the prior hearing. That hearing related only to Harvey's willingness to testify and not the events on the day of the shooting. The district court specifically limited the questioning to "Mr. Harvey's willingness to participate in the deposition" and "not about the incident." The few comments Harvey made regarding the day of the shooting were non-responsive stray remarks to questions regarding his refusal to be deposed. There was no reason for the prosecutor to inquire further regarding the day of the shooting. The State also did not have "an opportunity" to develop the testimony. The district court specifically found that it did not give "both parties a full opportunity to cross-examine Mr. Harvey on those statements." The district court also specifically found that it "cut off" further inquiry into the statements at issue because "the questions for Mr. Harvey were are you going to testify or are you not going to testify." The district court's findings are supported by substantial evidence and are binding on appeal. *See State v. Long*, 628 N.W.2d 440, 445 (Iowa 2001) ("If a court's factual findings with respect to application of the hearsay rule are not 'clearly erroneous' or without substantial evidence to support them, they are binding on appeal."). Under these circumstances, the district court did not err in excluding the statements as hearsay.

## III.

McCoy argues his convictions and sentences are illegal because the jury was not required to find there was an act constituting the assault element of the robbery charge distinct from the shooting. The State contends the argument is in reality a challenge to the jury instruction and not an illegal-sentencing issue. The

State argues McCoy failed to preserve error by challenging the jury instructions. We agree this is a challenge to the jury instructions, and we agree the defendant failed to preserve error. *See State v. Hepperle*, 530 N.W.2d 735, 740 (Iowa 1995) ("Failure to properly object to an instruction not only waives the right to assert error on appeal, but also allows the instruction, right or wrong, to become the law of the case.").

McCoy argues his counsel was ineffective for failing to raise the issue and request the instruction. A claim of ineffective assistance of counsel is reviewed de novo. *See* Iowa R. App. P. 6.907; *State v. Finney*, 834 N.W.2d 46, 49 (Iowa 2013). To establish counsel was ineffective, a defendant must demonstrate "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). Failure to prove either element is fatal to an ineffective-assistance claim. *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

The State charged McCoy with murder in the first degree under two alternatives: (1) premeditated murder; and (2) felony-murder. The marshaling instruction provided:

> The State must prove all of the following elements of Murder in the First Degree as charged in Count I:
> 1. On or about the 26th day of June, 2013, the defendant, or someone he aided and abetted, shot Christopher Byers.
> 2. Christopher Byers died as a result of being shot.
> 3. The defendant, or someone he aided and abetted, acted with malice aforethought.
> 4. (a) The defendant, or someone he aided or abetted, acted willfully, deliberately, premeditatedly and with a specific intent to kill Christopher Byers And/or
> (b) The defendant, or someone he aided and abetted, was participating in the offense of Robbery in the First Degree.

The marshaling instruction provided to the jury for the robbery charge was as follows:

> The State must prove all of the following elements of Robbery in the First Degree as charged in Count II:
> 1. On or about the 26th day of June, 2013, the defendant, or someone he aided and abetted, had the specific intent to commit a theft.
> 2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, the defendant, or someone he aided and abetted:
> a. Committed an assault on Christopher Byers; And/or
> b. Threatened Christopher Byers with, or purposely put Christopher Byers in fear of immediate serious injury.
> 3. The defendant, or someone he aided and abetted:
> a. Purposely inflicted or attempted to inflict a serious injury on Christopher Byers; And/or
> b. Was armed with a dangerous weapon.

Relying on *State v. Heemstra*, 721 N.W.2d 549, 557-58 (Iowa 2006); *State v. Millbrook*, 788 N.W.2d 647, 650 (Iowa 2010); and *State v. Tribble*, 790 N.W.2d 121, 128–29 (Iowa 2010), McCoy argues the convictions should merge because one cannot commit robbery without committing assault and the jury did not make a finding that the assault element of the robbery was independent of the shooting.

Our court recently decided the same issue. We quote at length from our prior opinion:

> In *Heemstra*, our supreme court held the felonious assault of willful injury could serve as the predicate offense for felony murder only in certain circumstances, for instance, 'if the defendant assaulted the victim twice, first without killing him and second with fatal results.' *Heemstra*, 721 N.W.2d at 556. In *Millbrook*, the court considered a felony murder conviction predicated on the defendant's participation in the felonious assault of intimidation with a dangerous weapon, concluding 'the fact that intimidation with a dangerous weapon is not a lesser-included offense of first-degree murder does not preclude application of the merger doctrine enunciated in

*Heemstra*.' *Millbrook*, 788 N.W.2d at 652. The *Millbrook* court ultimately upheld the murder conviction, finding the defendant committed an assaultive act sufficiently independent of the firing of the gun that resulted in the victim's death. *Id.* at 653–54. In *Tribble*, the court again considered a felony murder conviction based on the felonious assault of willful injury, and upheld the conviction because substantial evidence supported a jury finding that head trauma and asphyxia were caused by separate acts, either of which could have been the factual cause of the victim's death. *Tribble*, 790 N.W.2d at 129. Notably, *Heemstra*, *Millbrook*, and *Tribble* all address murder cases predicated on the forcible felony of felonious assault.

None of the cases relied upon by Pollard discusses the possibility of merger when robbery serves as the predicate felony for felony murder. In fact, the *Heemstra* court twice quoted authorities which identified robbery as an independent felony, not subject to merger. *See Heemstra*, 721 N.W.2d at 556, 558 (citing *Commw. v. Quigley*, 462 N.E.2d 92, 95 (Mass. 1984) (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 71, at 559 (1972) ("although rape, arson, robbery and burglary are sufficiently independent of the homicide, . . . aggravated battery toward the deceased will not do for felony murder") and citing *People v. Moran*, 158 N.E. 35, 36 (N.Y. 1927) ("The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape.")). *Millbrook* likewise quoted the *Moran* case from the New York Court of Appeals. *Millbrook*, 788 N.W.2d at 651.

A key question when considering the adequacy of Pollard's representation is whether competent defense counsel needed to urge an extension of those cases involving felonious assaults to felony murder prosecutions predicated on other forcible felonies listed in section 702.11(1). Counsel contemplating such an argument may have been deterred by our court's recent decision in *State v. Tucker*, 810 N.W.2d 519, 522 (Iowa Ct. App. 2012). In that case, we declined to extend the *Heemstra* merger rule to the predicate felony of arson, reasoning as follows:

> Unlike assault, using arson as the predicate felony does not frustrate the legislature's intent to establish gradations for assaultive conduct that results in death. Rather, application of the felony-murder rule in the case of arson is consistent with the traditional purpose of the felony-murder rule: deterring people from committing those felonies that present a

> heightened risk of death to others by transforming the felony offense sought to be deterred into first-degree murder if a person is killed in the course of the felony, even though the felon had no specific intent or premeditation otherwise necessary to elevate the killing of another into first-degree murder. *Heemstra*, 721 N.W.2d at 554 ("The rationale of the felony-murder rule is that certain crimes are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first-degree murder.").

*Tucker*, 810 N.W.2d at 522.

> Against this backdrop of case law on the merger rule, we decline to find counsel was ineffective for not challenging the felony murder instruction. We cannot rule out the possibility our supreme court might ultimately extend the merger rule for felony murder to the predicate felony of robbery. But it has not done so yet. Accordingly, we reject Pollard's argument that his attorney provided subpar representation by not objecting to robbery as the underlying felony. We do not require defense counsel to be a "'crystal gazer'—channeling the ability to predict future developments in the law. *See State v. Liddell*, 672 N.W.2d 805, 814 (Iowa 2003). Counsel did not breach an essential duty by failing to object to the marshalling instruction. *See State v. Williams*, 695 N.W.2d 23, 30 (Iowa 2005).

*State v. Pollard*, No. 13-1255, 2015 WL 405835, at *3-4 (Iowa Ct. App. Jan. 28, 2015). We see no reason to deviate from our prior conclusion in *Pollard*.

In addition, McCoy misapprehends the relevant question. The relevant question, for the purposes of merger in this context, is not whether the jury was required to make a finding that the assault element of the robbery was independent of the shooting. The relevant question is whether the act resulting in death was the same act constituting the predicate felony. *See Tribble*, 790 N.W.2d at 128 ("The first act must relate to an element of the predicate felony, while the second independent act must kill another person."). There is

substantial evidence of independent acts in this case.  Here, McCoy and Morris drew firearms during the robbery.  That was sufficient to establish robbery in the first degree independent of any act resulting in death.  *See* Iowa Code § 711.2. Morris and McCoy also demanded the car keys from Page and Harvey while brandishing guns.  That act was also sufficient to establish the predicate felony independent of the act resulting in Byers' death.  McCoy has thus not established *Strickland* prejudice.  We reject McCoy's claim for this additional reason.

IV.

For the foregoing reasons, we affirm the defendant's convictions and sentences.

**AFFIRMED.**